UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
YASER OTHMAN,

                          Plaintiff,

            -against-

CITY OF NEW YORK, SERGEANT BENJAMIN
BENSON, DETECTIVE SHAHEED RAHEEM,
DETECTIVE MICHAEL WALLEN, and DETECTIVE
SANDRA DAILEY,

                        Defendants.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**13-CV-4771 (NGG) (SJB)**

NICHOLAS G. GARAUFIS, United States District Judge.

       Plaintiff Yaser Othman brings this action under 42 U.S.C. § 1983 and relevant state law against Defendants the City of New York ("the City") and four individual police officers, Sgt. Benjamin Benson, Det. Shaheed Raheem, Det. Michael Wallen, and Det. Sandra Dailey (the "Individual Defendants" or "officers"). (Compl. (Dkt. 1).) Plaintiff claims that the Individual Defendants are liable for constitutional and state torts of false arrest and imprisonment, malicious prosecution, excessive force, and unlawful search, and that the City is municipally liable for the Individual Defendants' alleged infringements of his rights. (Id.)

       Before the court is Defendants' motion for summary judgment. (Defs. Mot. for Summ. J. ("Mot.") (Dkt. 53); Mem. in Supp. of Mot. ("Mem.") (Dkt. 57).) For the reasons that follow, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.    Facts

The parties agree on the following facts, except where otherwise noted.[1]

On the evening of June 2, 2012, Plaintiff Yaser Othman, then a Kings County assistant district attorney, was driving to Forest Hills, Queens. (Compl. ¶ 13; Pl. Dep. Tr. (Dkt. 58-1) 41:1-8.) As he pulled into the intersection of Ulmer Street and the Whitestone Expressway to make a right turn onto the highway entrance ramp, he noticed a tan minivan to his left also attempting to enter the highway at the same time. (Defs. Statement of Undisputed Material Facts ("Defs. 56.1") (Dkt. 55) ¶¶ 2-3.) The vehicles narrowly avoided a collision on the on-ramp, coming to a halt with their fronts nearly touching. (Id. ¶ 4; Pl. Dep. Tr. 54:20-55:1.) According to Plaintiff, Plaintiff honked his horn and said "what the hell are you doing," in response to which the driver of the minivan "gave [Plaintiff] the middle finger." (Pl. Dep. Tr. 55:21-24.) Both vehicles then proceeded to enter the highway. (Defs. 56.1 ¶ 5.)

The driver of the minivan was New York Police Department ("NYPD") Sergeant Benjamin Benson, en route to a buy-and-bust operation in an unmarked minivan. (Benson Criminal Court Tr. ("Benson Tr.") (Dkt. 56-4) 4:5-6, 23-24.) The minivan was also occupied by NYPD Detectives Shaheed Raheem, Michael Wallen, and Sandra Dailey. (Defs. 56.1 ¶ 3.) According to Benson, Plaintiff was driving "in and out of traffic without signaling," at either

---

[1] The court primarily draws these facts from Defendants' Local Rule 56.1 statement (Defs. Statement of Undisputed Material Facts ("Defs. 56.1") (Dkt. 55)) and Plaintiff's response (Pl. Resp. to Defs. 56.1 ("Pl. 56.1") (Dkt. 59)). The court notes that Plaintiff has responded to Defendants' "undisputed material facts" in a number of ways, including characterizing some factual statements as "lacking context" and claiming that some statements are "self-serving." (See, e.g., Pl. 56.1 ¶¶ 4, 21.) The court accordingly gives more weight to responses where Plaintiff states that a statement by Defendants "actually contradicts Plaintiff's rendition of the events in question" (see, e.g., id. ¶ 6) than responses where Plaintiff merely disagrees with Defendants' characterization of events the existence of which is not otherwise in doubt. Additionally, where additional evidence in the record is particularly relevant or clarifying, the court has relied on such evidence in the exercise of its considerable discretion to "conduct an assiduous review of the record" on a summary judgment motion. See Bacchus v. N.Y.C. Dep't of Educ., 137 F. Supp. 3d 214, 223 (E.D.N.Y. 2015).

"sixty-five to seventy" or "fifty-five to seventy" miles per hour in an area where the speed limit was fifty miles per hour. (Defs. 56.1 ¶ 6; Benson Tr. 11:21-22, 12:5, 13:7-8.) Benson further testified that the minivan sped up to "eighty to eighty-five" miles per hour in order to "catch [Plaintiff] and pull him over, just to see if he was drinking or anything like that." (Defs. 56.1 ¶ 7-8; Benson Tr. 12:5-7.) Plaintiff, meanwhile, claims that the minivan repeatedly swerved in front of him and came to a number of "dead stop[s]" in the middle of traffic, ultimately causing Plaintiff to miss his exit. (Pl. Dep. Tr. 59:6-63:20.) Plaintiff states that he "slowed down two times at least" to let the minivan "get away" from him, but the minivan "would go ahead a little bit and then wait for [Plaintiff] to catch up." (Id. 67:2-9.) According to Plaintiff, the minivan was "never behind" his car, but rather "always in front of" him. (Id. 67:11-12.) Eventually, the minivan pulled alongside the driver's side of Plaintiff's car. (Defs. 56.1 ¶ 9.) Raheem, the officer in the passenger seat of the minivan, flashed his detective shield through the open window and told Plaintiff to pull over. (Id.; Benson Tr. 13:13-25.) Plaintiff claims that he noticed the minivan pull alongside his car but that he could neither see Raheem's gesture through the minivan's tinted windows nor hear the command to pull over. (Pl. Dep. Tr. 63:1-10.) Both vehicles then proceeded to exit the highway at Astoria Boulevard. (Defs 56.1 ¶ 14.)

The minivan came to a stop at a traffic light at the intersection of Astoria Boulevard and Ditmars Boulevard, and Plaintiff stopped approximately one car length behind. (Id. ¶¶ 14-15.) Benson and Raheem got out of the minivan, guns drawn and possibly pointed at Plaintiff. (Id. ¶ 16; Pl. Resp. to Defs. 56.1 ("Pl. 56.1") (Dkt. 59) ¶ 16.) The officers were wearing street clothes; Benson had his shield around his neck, though it was "tucked inside" the "hockey or football jersey" he was wearing. (Defs. 56.1 ¶ 19.) As Benson approached Plaintiff's car he "discourteous[ly]" (Pl. 56.1 ¶ 17) ordered Plaintiff to show his hands, either shouting, per

Plaintiff, "[L]et me see your hands mother fucker" (Pl. Dep. Tr. 69:7-10); or, per Benson, "Let me see your fucking hands" (Benson Tr. 19:8-10). The officers ran to Plaintiff's driver-side door, repeatedly ordering him to exit the car as they approached. (Defs. 56.1 ¶ 18.) Plaintiff asked whether Benson and Raheem were "cops," at which point Benson removed his shield from underneath his jersey and showed it to Plaintiff. (Defs. 56.1 ¶ 20; Pl. Dep. Tr. 70:8-9.) Plaintiff continued to sit in his car so the officers opened the door. (Defs. 56.1 ¶ 21.) Defendants claim that Plaintiff stared at the officers and then told them to "hold on, hold off" because he wanted to show them his identification card. (Id. ¶¶ 22-23.) Plaintiff states that he hesitated in exiting the car because he wanted to put the car in park. (Pl. Dep. Tr. 71:3-9.)

The officers opened the door and, in Benson's words, "ripped [Plaintiff] out of the car." (Benson Tr. 22:1.) In order to remove Plaintiff, Benson claims to have reached in and unclipped Plaintiff's seatbelt; Plaintiff, for his part, claims the officers pulled him out so forcefully that the belt buckle "snapped," releasing the belt although not, apparently, breaking the buckle. (Benson Tr. 21:10-11; Pl. Dep. Tr. 74:7-23.) According to Plaintiff, Benson pulled Plaintiff out by his shirt so hard that it ripped, and then grabbed him by the neck. (Id. ¶ 29.)

Once Plaintiff was out of the car, the officers held him against his car while they searched his pockets. (Id. ¶¶ 30-31.) At some point during this interaction Wallen exited the minivan and joined Raheem and Benson in detaining Plaintiff. (Defs. 56.1 ¶ 31.) Plaintiff states that Wallen had his gun pointed at the ground while Raheem pointed his gun at Plaintiff and maintained one hand on Plaintiff's shirt. (Pl. Dep. Tr. 75:14-22, 76:18-22.) Plaintiff claims that Benson was holding both of his hands around Plaintiff's neck "squeezing as hard as he could" for "[a] minute [or] 90 seconds." (Id. at 78:17-23, 79:20-22.) Defendants claim that, during this interaction, Plaintiff kept trying to grab Benson and move his hands. (Defs. 56.1 ¶ 32.) Plaintiff has stated

4

both that he was standing there "compliantly" (Pl. Dep. Tr. 80:9-10) and that he was trying to

remove Benson's hands from around his neck (Id. 73:16-22; Pl. Mem. in Opp'n to Mot. ("Pl.

Opp'n") (Dkt. 60) at 3).  Meanwhile, the final officer in the minivan, Dailey, had gotten out and

was standing off to the side, directing traffic.  (Defs. 56.1 ¶ 34.)

Eventually, Plaintiff managed to tell the officers that he was an assistant district attorney,

which they confirmed by removing his wallet from his pocket and examining his identification

card and shield.  (Pl. Dep. Tr. 80:18-21.)  According to Plaintiff, this prompted Wallen to remark

colorfully, "oh, shit, he is an ADA."  (Id.)  The officers then put Plaintiff in handcuffs,

"squeez[ing]" them "tight" so as to cause Plaintiff "[b]ruises, redness, [and] pain."  (Pl. Dep. Tr.

82:14-21, 91:24-92:3; Defs. 56.1 ¶¶ 33, 47.)[2]  They then placed him in the back of the minivan

and drove him to the 115th Police Precinct, where they installed Plaintiff in a solitary holding

cell.  (Defs. 56.1 ¶ 35; Pl. Dep. Tr. 91:5-6.)  After being led into the police station, Plaintiff

claims that Benson told the other officers, "[L]ook at what I got. I got me an ADA, one of

Charles Hines' finest."  (Pl. Dep. Tr. 91:7-10.)

The arrest report charged Plaintiff with reckless endangerment in the first degree; assault

in the second degree; resisting arrest; and reckless driving.  (Defs. 56.1 ¶ 36; Arrest Report (Dkt.

56-5) at 1.)  The next day, Plaintiff was arraigned in Queens County Criminal Court on the

charges of reckless endangerment in the second degree; obstruction of governmental

administration in the second degree; resisting arrest; reckless driving; attempted assault in the

third degree; unlawful possession of marijuana; and failure to signal.  (Defs. 56.1 ¶ 37; Crim. Ct.

Compl. (Dkt. 56-6).)  The court released Plaintiff without imposing bail or restrictions on his

travel.  (Defs. 56.1 ¶ 38.)  On July 24, 2012, the Queens County District Attorney's Office (the

---

[2] Plaintiff did not seek medical attention for this or any other injury resulting from the incident.  (Defs 56.1 ¶ 48.)

"QCDA") dismissed the marijuana possession charge. (Compl. ¶ 40.) On November 30, 2012, the criminal court conducted a probable cause hearing into the other six charges and did not dismiss any of them. (Defs. 56.1 ¶ 41.) The QCDA proceeded to trial on the charges of reckless endangerment, resisting arrest, and reckless driving. (Id. ¶ 39; Prosecutor's Informations (Dkt. 56-7).) The QCDA abandoned the charges of obstruction of governmental administration, attempted assault, and failure to signal on July 24, 2013. (Compl. ¶ 42; Tr. of Proceedings 4:22-5:13, People v. Othman, No. 2012QN030238 (N.Y. Crim. Ct. July 24, 2013).) On October 10, 2013, following a bench trial, Plaintiff was found guilty on the count of reckless driving and not guilty on the counts of resisting arrest or reckless endangerment. (Defs. 56.1 ¶ 41.) On June 10, 2016, the Appellate Term for the Second District affirmed his conviction. (Id. ¶ 42.)

**B.     Procedural History**

Plaintiff commenced this action on August 26, 2013, while his criminal trial was still pending. Originally, Queens County Assistant District Attorney Daniel O'Leary was a defendant in this case, but he was dismissed from the case on April 27, 2015, at which point the court stayed Plaintiff's claims against the remaining defendants pending the resolution of his state court appeal. (Order Adopting R&R (Dkt. 26).) On June 16, 2016, Plaintiff informed the court that the Appellate Term had rejected his appeal. (June 16, 2016, Letter (Dkt. 36).) On June 23, 2016, the court lifted the stay of proceedings in the instant case. (June 23, 2016, Order Lifting Stay (Dkt. 37).) The parties completed discovery on January 16, 2017. (Nov. 23, 2016, Order; Jan. 17, 2017, Order.) On February 1, 2017, Defendants sought leave from the court to move for summary judgment (Feb. 1, 2017, Letter (Dkt. 48)), a request that the court granted (Feb. 2, 2017, Min. Entry). The parties filed the fully briefed motion for summary judgment on June 15, 2017.

## II.   LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." Figueroa v. Mazza, 825 F.3d 89, 98 (2d Cir. 2016) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The movant may discharge this burden by showing that the non-moving party has 'fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co., 255 F. Supp. 3d 443, 451 (S.D.N.Y. Apr. 28, 2015) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "'The mere existence of a scintilla of evidence' in support of the non-movant will be insufficient to defeat a summary judgment motion." Transflo Terminal Servs., Inc. v. Brooklyn Res. Recovery, Inc., 248 F. Supp. 3d 397, 399 (E.D.N.Y. 2017) (quoting Liberty Lobby, 477 U.S. at 252).

"In determining whether an issue is genuine, '[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" SCW West LLC v. Westport Ins. Corp., 856 F. Supp. 2d 514, 521 (S.D.N.Y. 2012) (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995)). "[T]he judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 249). However, "[a] party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment," and "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

Ordinarily, when the party opposing a motion for summary judgment is proceeding pro se, the court must read his or her briefs "liberally and interpret them to raise the strongest arguments that they suggest." Corcoran v. N.Y. Power Auth., 202 F.3d 530, 636 (2d Cir. 1999) (internal quotation marks omitted). "Where the plaintiff is an attorney, however, as Plaintiff is here, he or she is not entitled to the same liberality afforded other pro se plaintiffs." Gundlach v. IBM Japan, Ltd., 983 F. Supp. 2d 389, 393 (S.D.N.Y. 2013); see also Heller v. Emanuel, No. 07-CV-1393 (ARR), 2007 WL 1491081, at *2 (E.D.N.Y. May 21, 2007) (declining to read liberally the pleadings of a disbarred attorney proceeding pro se).

## III.    CONDITIONS PRECEDENT TO SUIT

Under New York law, a plaintiff bringing a state-law tort action against a municipality or any employee thereof must file a notice of claim within ninety days of the claim's accrual. N.Y. Gen. Mun. Law [GML] § 50-e(1)(a). In addition, a municipal defendant in such a case may—though is not required to—"demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made." GML § 50-h(1). "[G]enerally, '[a] party who [fails] to comply with a demand for examination pursuant to [GML] § 50-h is precluded from commencing an action against a municipality." Duncan v. City of New York, No. 11-CV-3901 (ENV), 2017 WL 3105856, at *5 (E.D.N.Y. July 21, 2017) (second, third, and fourth alterations in original) (quoting Kemp v. County of Suffolk, 878 N.Y.S.2d 135, 136 (App. Div. 2009)). Because GML § 50-h "does not refer to claims filed against 'officers, appointees

and employees' of municipal corporations," failure to attend a 50-h hearing can only bar a plaintiff's state-law claims against a municipality, not its employees. Bradley v. Golphin, No. 14-CV-4289 (NGG), 2018 WL 480754, at *4 (E.D.N.Y. Jan. 18, 2018); see also id. (collecting cases).

Plaintiff submitted his 50-e notice on or about August 7, 2012, within the ninety-day window for submission following the accrual of his claim on June 2, 2012. (Defs. 56.1 ¶ 43.) After Plaintiff submitted the notice, the Office of the Comptroller scheduled a 50-h hearing. (Id. ¶ 44.) Plaintiff requested and received an adjournment of the hearing until the conclusion of his state criminal proceedings. (Id. ¶¶ 44-45.) Plaintiff never contacted the Office of the Comptroller to reschedule the hearing further. (Defs. 56.1 ¶ 45.) Plaintiff commenced the instant action on August 26, 2013, before the conclusion of his state criminal trial. (Compl.) Defendants contend that Plaintiff's state-law claims should be dismissed on the basis of Plaintiff's failure to reschedule the 50-h hearing. (Mem. at 31.)

The court must dismiss Plaintiff's state-law claims of municipal liability because he did not wait until the conclusion of his state criminal case to file suit. When a 50-h hearing is postponed by mutual agreement until the occurrence of a certain event—in this case, the termination of Plaintiff's case in Queens County Criminal Court—the putative plaintiff must wait until that event has transpired before filing his lawsuit. See Restivo v. Village of Lynbrook, 444 N.Y.S.2d 189, 190 (App. Div. 1981). Even if the City would have borne the ultimate burden to reschedule the hearing, see Doyle v. City of Corning, No. 14-CV-6507, 2015 WL 2092574, at *7-8 (W.D.N.Y. May 5, 2015) (citing S. Tier Plastics, Inc. v. County of Broome, 862 N.Y.S.2d 175, 176-77 (App. Div. 2008)), Plaintiff's hastily filed suit precludes the City's failure to do so from being fatal to its argument. The court notes, however, that Plaintiff's error in not waiting

until the City had a chance to reschedule the 50-h hearing only bars his state claim for municipal

liability—not, as Defendants would have it, all of his claims premised on state law (Mem. at 31;

Defs. Reply at 10).  See Bradley, 2018 WL 480754, at *4.

## IV.   CLAIMS UNDER FEDERAL LAW

Plaintiff brings five claims under § 1983: Excessive force; false arrest; malicious

prosecution; unlawful search; and municipal liability.  For the reasons that follow, the court

GRANTS Defendants' motion for summary judgment on all claims except the excessive force

claim against Benson.

### A.     Excessive Force

"[C]laims that law enforcement officers have used excessive force . . . in the course of an

arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth

Amendment and its 'reasonableness' standard."  Graham v. Connor, 490 U.S. 386, 395 (1989).

"The calculus of reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation."  Id. at 396-97.

Factors relevant to the determination of whether the government intruded too far on a suspect's

Fourth Amendment rights include the severity of the crime at issue, whether the suspect posed an

immediate threat to the safety of the officers or others, and whether the suspect was actively

resisting arrest.  Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015) (citing Graham v.

Connor, 490 U.S. at 396).  "Defendants are liable as long as the force used exceeded the force

needed for the factual circumstances and the fact that Plaintiff may not have sustained serious

long lasting harm is not dispositive."  Graham v. City of New York, 928 F. Supp. 2d 610, 618

(E.D.N.Y. 2013); see also Lemmo v. McKoy, No. 08-CV-4264 (RJD), 2011 WL 843974, at *5-6

(E.D.N.Y. Mar. 8, 2011) (collecting cases in which courts have both permitted and dismissed excessive force claims predicated on de minimis injury). While "not every push or shove constitutes excessive force," Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995) (citing Graham v. Connor, 490 U.S. at 396), a show of force by an officer that is grossly disproportionate to the risk of harm, as determined by the Graham v. Connor factors, may support a claim for excessive force.

"That multi-factor test is not meant to be applied rigidly, however, and the inquiry into whether force is reasonable requires an objective examination of the totality of the circumstances." Gersbacher v. City of New York, No. 14-CV-7600 (GHW), 2017 WL 4402538, at *9 (S.D.N.Y. Oct. 2, 2017) (internal quotation marks omitted). The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 100. "[G]ranting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (Sotomayor, J.).

       1.    Physical Force During Arrest

Plaintiff brings two claims of excessive force predicated on physical contact between Plaintiff and certain defendants: (1) his forcible removal from his car by Raheem and Benson; and (2) his handcuffing by Wallen, Benson, and Raheem. For the reasons that follow, the court denies Defendants' motion for summary judgment as to the first allegation and grants it as to the second allegation.

a.    *Removal from the Car*

Plaintiff claims that Raheem and Benson "grabb[ed]" him and ripped his shirt while they were pulling him out of his vehicle, followed by Benson "choking" Plaintiff while the officers were effecting his arrest. (Pl. Dep. Tr. 73:17-22, 82:8-9.)[3] Defendants do not contest that this sequence of events occurred. (See Mem. at 10-11; Defs. 56.1 ¶¶ 21-31.) Instead, they claim that the force used by Raheem and Benson was reasonable because the officers "were confronted with a potentially dangerous situation" given Plaintiff's reckless driving, his repeated refusal to exit his car, and their contention that he was "reaching for an [unknown object]." (Mem. at 10.) They additionally claim that Benson was simply "hold[ing] [P]laintiff against the car to prevent him from interfering with or preventing a search of his person, and from creating a potentially dangerous situation." (Id. at 11.) Plaintiff did not seek medical attention for any injuries stemming from these interactions. (Defs. 56.1 ¶ 48.) According to Defendants, summary judgment is warranted because any force exercised by the officers that allegedly injured Plaintiff was "objectively reasonable" (Mem. at 8-12) and, regardless, only resulted in "de minimis injuries" (id. at 14-15).

Defendants have the better argument as to whether Raheem and Benson used excessive force when they pulled Plaintiff from his car. When a suspect evinces unwillingness to exit his vehicle after being requested to do so by a police officer, the officer may have cause to forcibly remove the suspect from his vehicle. See Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995). Accordingly, an officer who "wrap[s] his arm around [the suspect's] neck, shoulder, and arm,

---

[3] Plaintiff also claimed in the Complaint that Wallen "shoved [him] into [the police] minivan" causing him to hit his head (Compl. ¶ 33) but he did not raise this allegation during his deposition. Defendants contend that Plaintiff has abandoned this argument. (Mem. at 5 n.1.) Even assuming that Plaintiff did not abandon this argument, the court grants Defendants summary judgment as to this altercation because Plaintiff has not alleged any facts that would lead the court to conclude that this supposed "shove" was objectively unreasonable.

and pull[s] her from the car" has committed nothing more than an "extremely limited" intrusion on the suspect's Fourth Amendment rights, if any intrusion at all. Id. That is the case here: The officers approached Plaintiff's car and ordered him to show them his hands and step outside the car, a demand which they repeated around ten times; when Plaintiff did not respond, the officers forcibly removed him from his car, ripping his shirt in the process. (Defs. 56.1 ¶¶ 17-29.) This was not an objectively unreasonable course of events given Plaintiff's refusal to follow the officers' clear instructions, and there is nothing to suggest that the injury to Plaintiff was anything more than de minimis. Plaintiff may have been jarred by his removal from the car, but it cannot be said that this use of force was objectively unreasonable.

The removal of Plaintiff from the car was not, however, the end of his pre-arrest interactions with the officers. As the officers were removing Plaintiff from the car, Plaintiff alleges that Benson started "choking and squeezing" his neck so hard that he could not speak. (Pl. Opp'n at 3.) Plaintiff states that this continued for around a minute, until the officers turned him around and placed the handcuffs on his wrists. (Pl. Dep. Tr. 21-22.) It is not clear to the court that this course of action was objectively reasonable. Defendants' main argument against the charge of excessive force—that Plaintiff was refusing to comply with their instructions to exit his car—is inapplicable given that Plaintiff had already been removed from his car. Defendants do state that, once removed from the car, "[P]laintiff continued to resist by grabbing at Benson, and trying to move his hands, again evidencing his noncompliance with the officers," but this characterization of events is not, as Defendants claim, "undisputed." (Mem. at 11.) Plaintiff has stated on numerous occasions that, to the extent he was trying to remove Benson's hands from his neck, he was doing so in an attempt to explain that he was an assistant district attorney. (Pl. Test. from State Ct. (Dkt. 58-3) at 14:6-11; Pl. Dep. Tr. 73:16-22; Pl. Opp'n at 3.)

Plaintiff's conviction of reckless driving is not, by itself, a severe enough crime to justify the use of a disproportionately strong show of force to bring him under arrest; and, to the extent that Plaintiff was charged with additional offenses, Plaintiff was not convicted of any of those offenses, and the support for some of the more severe charges (e.g., third-degree assault) seems to have rested on the same disputed evidentiary grounds that prevent the court from granting Defendants summary judgment here. Cf. Gersbacher, 2017 WL 4402538, at *11 (using the lack of "aggressive conduct" in the "underlying facts" to bear upon the question of the severity of the crime for which the plaintiff was arrested).

The court also rejects Defendants' argument that Plaintiff's lack of major injury stemming from the alleged chokehold is fatal to his claim of excessive force. Many courts in this circuit have found that "a plaintiff need not allege 'permanent or severe' injury to prevail on an excessive force claim." Franks v. New Rochelle Police Dep't, No. 13-CV-636 (ER), 2015 WL 4922906, at *14 (S.D.N.Y. Aug. 18, 2015). While "not every push or shove constitutes excessive force," Lennon, 66 F.3d at 426, a use of force that presents as objectively unreasonable can support a plaintiff's constitutional claim. See Franks, 2015 WL 4922906, at *14 (collecting cases). Defendants may be correct that "the only physical injuries [P]laintiff alleges as a result of the June 2, 2012 incident is pain and bruising to his neck and wrists, and his voice not being the same" (Mem. at 14-15), but that determination is not fatal to Plaintiff's claim given the myriad questions that remain about the force itself. The question of reasonableness "presents a genuine issue for the jury to evaluate at trial." Franks, 2015 WL 4922906, at *15.

b.    Handcuffs

"Courts apply a separate standard to claims for excessive force in the use of handcuffs." Sachs v. Cantwell, No. 10-CV-1663 (JPO), 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012).

"[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." Case v. City of New York, 233 F. Supp. 3d 372, 385 (S.D.N.Y. 2017) (first alteration in original) (quoting Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)). "Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." Omor v. City of New York, No. 13-CV-2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015). "The injuries need not be severe or permanent, but must be more than merely de minimis." Usavage v. Port Auth. of N.Y. & N.J., 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013) (internal citations and quotation marks omitted).

Plaintiff alleges that Defendants placed handcuffs on him "extra tight, causing [him] to suffer great pain and lacerations to the wrists." (Compl. ¶ 32.) Even accepting Plaintiff's claims that the handcuffs were unreasonably tight and that Defendants ignored his complaints (Pl. Opp'n at 11), Plaintiff cannot show the level of injury required to sustain an excessive force claim on the basis of handcuffing. He says that he had wrist pain that lasted for two to three days following his arrest (Pl. Dep. Tr. 108:23-24) and wrist bruising that lasted for about a week (id. at 109:15-17). He did not seek medical attention for these alleged injuries. (Defs. 56.1 ¶ 48.) Plaintiff's temporary injuries, which did not cause long-lasting pain and did not require medical attention, cannot form the basis of an excessive force claim. See Omor, 2015 WL 857587, at *8 (denying excessive force claim in part because the plaintiff did not claim "that he suffered any serious or permanent injury from the handcuffs"); Sachs, 2012 WL 3822220, at *15 (denying excessive force claim for handcuffing because the plaintiff did not seek medical attention for her

injuries, which amounted to twenty-four hour swelling of the wrists); Washpon v. Parr, 561 F.

Supp. 2d 394, 407 (S.D.N.Y. 2008) ("A line of cases holds that minor injuries that result from

tight handcuffs, such as temporary swelling, inflammation or soreness of an arrestee's wrists, are

insufficient on their own to sustain a Fourth Amendment excessive force claim."). The court

accordingly grants summary judgment for Defendants on Plaintiff's claim on the basis of tight

handcuffs.

### 2. Non-Physical Force During Arrest

"Courts within the Second Circuit have been reluctant to entertain excessive-force claims

without any physical contact. Mere threats or verbal harassment, without any 'appreciable

injury,' generally are not actionable under section 1983." Merrill v. Schell, 279 F. Supp. 3d 438,

443 (W.D.N.Y. 2017) (citing Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (per

curiam)). To that end, "the vast majority of cases within the Second Circuit hold that merely

drawing weapons when effectuating an arrest does not constitute excessive force as a matter of

law." Dunkelberger v. Dunkelberger, No. 14-CV-3877 (KMK), 2015 WL 5730605, at *14

(S.D.N.Y. Sept. 30, 2015). There are times, however, where "verbal threats, combined with the

brandishing of the weapon, [can] be unreasonable and therefore constitute excessive force."

Green v. City of Mount Vernon, 96 F. Supp. 3d 263, 296 (S.D.N.Y. 2015).

Plaintiff alleges that, after he pulled over, Benson and Raheem both approached his

vehicle while pointing their guns at him and shouting, "Let me see your hands mother fucker"

and "Get out of the car, mother fucker." (Compl. ¶¶ 23-24.) While this language may have

been, in Plaintiff's words, "discourteous" (56.1 Resp. ¶ 17), the use of curse words is not enough

to elevate the pointing of guns without any physical impact to a level necessary to sustain a claim

of excessive force. In Merrill, by contrast, the court found that the plaintiff made out a claim of

excessive force where a police officer "drew his weapon, pointed it at [the plaintiff, who was unarmed, handcuffed, and in the back of a police car,] within a few inches of his head, and directed him to stop seeking custody of his daughter and pay child support." 279 F. Supp. 3d at 444. Plaintiff does not allege that Benson or Raheem made any threats as they pointed their weapons at him, or that they continued to train their weapons on him after he was in police custody. Plaintiff merely says that "established legal principles do not differentiate between use of actual violence and the mere threat to use such violence" (Pl. Opp'n at 9), an assertion that is flatly contradicted by the large body of law on this topic. The only citation that Plaintiff offers in support of his excessive force claim against Benson and Raheem premised on their pointing of their weapons against him is the NYPD patrol guide, which Plaintiff says "prohibits NYPD officers from cocking a firearm[] and pointing [it] at individuals unless they have probable cause to believe that they must protect themselves or another person present from imminent death or serious physical injury." (Id.)[4] But "local agency-established policies, such as the Patrol Guide, do not establish constitutional standards." Cerbelli v. City of New York, No. 99-CV-6846 (ARR) (RML), 2008 WL 4449634, at *10 (E.D.N.Y. Oct. 1, 2008). Because Plaintiff cannot show that Benson and Raheem pointed their guns at him in a constitutionally excessive manner, the court rejects Plaintiff's claim on this ground.

3.    No Personal Involvement

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). "A police officer is personally involved in the use of excessive force if the officer either:

---

[4] This rule "[d]irect[s] members concerned not to use their firearms or use any other deadly physical force unless their lives or the life of another is in imminent danger." NYPD Patrol Guide Procedure No. 221-13 (2017).

(1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so." Vesterhalt v. City of New York, 667 F. Supp. 2d 292, 297 (S.D.N.Y. 2009) (citing Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997)). "An officer is liable [for failure to intervene in excessive force] if he failed to uphold his 'affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.'" Walker v. City of New York, No. 11-CV-314 (CBA) (JMA), 2014 WL 12652345, at *12 (E.D.N.Y. Sept. 3, 2014) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)). A plaintiff bringing a claim on the basis of a defendant's failure to intervene in excessive force must show that the defendant was aware of the use of excessive force by other officers, that she had a reasonable opportunity to intervene, and that she intentionally refused to take measures to end the use of excessive force, all of which are required for Plaintiff to succeed on his claim. Cicio v. Graham, No. 08-CV-534, 2009 WL 537534, at *5 (N.D.N.Y. Mar. 3, 2009) (citing Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001)).

Plaintiff has offered no facts that would allow a reasonable jury to conclude that Dailey witnessed, had an opportunity to intervene in, or refused to take measures to prevent the alleged excessive force to Plaintiff from occurring. During the arrest, Dailey was "next to the rear of [P]laintiff's car directing traffic." (Defs. 56.1 ¶ 34.) According to Defendants, she "'was not involved' with any of the interaction with [P]laintiff." (Id.) Plaintiff contends that "all four defendants acted in concert with each other and aided each other" and that Dailey is culpable for failing to intervene in the alleged assault by her coworkers upon Plaintiff" (Pl. Opp'n at 8-9), but he did not mention Dailey's alleged failure to intervene in his complaint, and during his deposition merely stated that Dailey "was standing next to the rear of [his] car directing traffic

away" (Pl. Dep. Tr. 88:6-7). Even if Dailey was at the scene of the incident for its duration, "the mere fact that [an officer] was present for the entire incident does not, on its own, establish that [she] had either awareness of excessive force being used or an opportunity to prevent it." Rodriguez v. City of New York, No. 10-CV-9570 (PKC), 2012 WL 1658303, at *5 (S.D.N.Y. May 11, 2012). Plaintiff's claim against Dailey fails.

### 4. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Id. (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)); see Malley v. Briggs, 475 U.S. 335, 341 (1986) ("[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized."). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" Mullenix, 136 S. Ct. at 308 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)).

"Where the right at issue in the circumstances confronting police officers was clearly established but was violated, the officer will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." Outlaw v. City of Hartford, 884 F.3d 351, 366 (2d Cir. 2018). Whether an officer's conduct was objectively reasonable is a mixed question of law and fact, in which the factfinder resolves disputes over historical facts and the court makes the "ultimate legal determination of whether qualified immunity attaches on those facts." Id. at 367 (quoting Kerman v. City of New York,

374 F.3d 93, 109 (2d Cir. 2004)).  "[T]he defendant's entitlement to qualified immunity should be resolved 'at the earliest possible stage in litigation.'" Lynch v. Ackley, 811 F.3d 569, 576 (2d Cir. 2016) (quoting Pearson, 555 U.S. at 231-32).

"In the excessive force context, summary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." O'Brien v. Barrows, 556 F. App'x 2, 4 (2d Cir. 2014) (summary order) (alterations adopted) (internal quotation marks omitted) (citing O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)).  While the question of objective reasonableness is different from the question of whether there was any violation to begin with, "courts in this Circuit have made clear that, 'since the law in this area is well established[,] the qualified immunity is the same as the inquiry made on the merits.'" Franks, 2015 WL 4922906, at *16 (alterations adopted) (quoting Washpon, 561 F. Supp. 2d at 407).

Defendants claim that Benson's actions are entitled to qualified immunity because "the officers were clearly in a tense circumstance with [P]laintiff and had to make split second decisions to ensure their safety." (Mem. at 35.)  This claim, however, is the crux of what is in dispute: because a jury could find that Benson "choked" Plaintiff for around one minute and that such force was objectively unreasonable under the circumstances, a jury could also find that Benson's use of such force violated Plaintiff's clearly established right under the Fourth Amendment to be free of excessive force.  The Second Circuit has found qualified immunity in situations such as this to be appropriate only where the officer could have reasonably believed that the suspect posed a danger to the officers; here, a jury finding of excessive force necessarily

precludes that conclusion, making the request for qualified immunity premature. See Parker v. City of Long Beach, 563 F. App'x 39, 41 (2d Cir. 2014) (summary order).

At the point of summary judgment, the court therefore finds it inappropriate to dismiss Plaintiff's excessive force claim on grounds of qualified immunity. See, e.g., Lloyd v. City of New York, 246 F. Supp. 3d 704, 722-23 (S.D.N.Y. 2017) (denying summary judgment on qualified immunity defense where there remain disputed issues of fact as to the plaintiff's allegation of excessive force); Zachary v. City of Newburgh, No. 13-CV-5737 (VB), 2016 WL 4030925, at *11 (S.D.N.Y. July 25, 2016) (same); Franks, 2015 WL 4922906, at *16 (same).

## B. False Arrest

To prevail on a claim for false arrest, a plaintiff must plead that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (quoting Broughton v. State, 335 N.E.2d 310, 314 (N.Y. 1975)). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). Conviction on the offense for which an arrest was made is conclusive evidence of probable cause, as long as that conviction survives appeal. Weyant, 101 F.3d at 852; see also Cameron v. Fogarty, 806 F.2d 380, 387 (2d Cir. 1986) (stating that § 1983 incorporates the common-law rule that a false-arrest plaintiff "can under no circumstances recover if he was convicted of the offense for which he was arrested"). Because an arrest on multiple charges is "still only one arrest, i.e., one intrusion into plaintiff's liberty," John v. Lewis, Nos. 15-CV-5346 (PKC), 15-CV-6583 (PKC), 2017 WL 1208428, *12

(E.D.N.Y. 2017), a conviction on any of the charges for which the arrest was made will preclude a claim of false arrest. See Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) (Sotomayor, J.).

Plaintiff was arrested on charges that included reckless driving. (Defs. 56.1 ¶ 36.) He was convicted of reckless driving and that conviction survived on appeal. (Id. ¶¶ 41-42.) That is fatal to Plaintiff's false arrest claim. Plaintiff attempts to keep his claim alive by arguing that reckless driving is a misdemeanor for which drivers are "normally issued a traffic ticket, not arrested," and thus his conviction for this offense cannot justify an arrest that would likely not have taken place but for the other charges unsuccessfully brought against him. (Pl. Opp'n at 13.) The court rejects Plaintiff's argument. An officer who "has probable cause to believe that an individual has committed even a very minor criminal offense in his presence . . . may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). Additionally, state law provides a maximum penalty for reckless driving of up to thirty days' imprisonment, contradicting Plaintiff's intimation that this offense is not arrestable. See N.Y. Veh. & Traf. Law §§ 1212, 1801(1). Even if probable cause did not exist to arrest Plaintiff for any of the other crimes for which he was charged, his conviction of reckless driving suffices to invalidate his claim of false arrest. See, e.g., Wasser v. Battista, No. 08-CV-2839 (RJD), 2009 WL 2753184, at *4 (E.D.N.Y. 2009) (dismissing false arrest claim because probable cause existed for the plaintiff's arrest based on his guilty plea for reckless driving). Defendants are therefore entitled to summary judgment on Plaintiff's claim of false arrest.

### C.    Malicious Prosecution

The substance of a § 1983 claim for malicious prosecution is analyzed under state law. See Conway v. Village of Mount Kisco, 750 F.2d 205, 214 (2d Cir. 1984). New York "law . . . places a heavy burden on malicious prosecution plaintiffs." Smith-Hunter v. Harvey, 734 N.E.2d

750, 752 (N.Y. 2000). "To establish a malicious prosecution claim under New York law, a plaintiff must prove "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" Id. at 161 (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)). A claim for malicious prosecution under § 1983 also requires the plaintiff to "show a 'seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" Mitchell v. City of New York, 841 F.3d 72, 79 (2d Cir. 2016) (quoting Washington v. County of Rockland, 373 F.3d 310, 316 (2d Cir. 2004)); see also Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003) ("To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty.").

1.    Initiation of a Proceeding

"In general, 'once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution.'" Levy v. City of New York, 935 F. Supp. 2d 575, 588 (E.D.N.Y. 2013) (alteration adopted) (quoting Douglas v. City of New York, 595 F. Supp. 2d 333, 342 (S.D.N.Y. 2009)). If, however, the plaintiff can produce evidence that the prosecutor was "misled or pressured" by the defendant police officers, the officer may be said to have "initiated" the proceeding. Dufort v. City of New York, 874 F.3d 338, 352 (2d Cir. 2017). A plaintiff may show that a defendant officer "played an active role in the prosecution," something which courts have found satisfied where "the defendant-officer brought formal charges and had the [plaintiff] arraigned, filled out

complaining and corroborating affidavits, [or] swore to and signed a felony complaint." Espada v. Schneider, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007).

As Defendants admit, the criminal court complaint was signed by Dailey and was based on statements given by Benson. (Mem. at 21; Crim. Ct. Compl.) Accordingly, there is a triable issue of fact as to whether these two defendants initiated the prosecution against Plaintiff.

With regard to Wallen and Raheem, Plaintiff argues that they initiated the prosecution because they "lied and corroborated each other's lies, to varying degrees that will be explored at trial." (Pl. Opp'n at 15.) Plaintiff does not state what they lied about or how they did it. These conclusory allegations are insufficient to support a claim of malicious prosecution. Without "evidentiary support" underlying a claim that Wallen and Raheem lied on the charging paperwork, Plaintiff's malicious prosecution action against them cannot proceed. See Lovelace v. City of New York, No. 02-CV-5398 (FB), 2005 WL 552387, at *2 (E.D.N.Y. Mar. 9, 2005); see also Brown v. City of New York, No. 08-CV-5095 (FB), 2013 WL 1338785, at *4 (E.D.N.Y. Apr. 1, 2013) (rejecting claim of malicious prosecution where "[t]he only evidence that plaintiff has to support his version of events . . . is plaintiff's own testimony"). That Wallen and Raheem gave testimony at Plaintiff's criminal trial is not enough to satisfy the initiation prong. See Manganiello, 612 F.3d at 163 ("To initiate a prosecution, a defendant must do more than . . . give testimony."). Plaintiff's inability to specify how Wallen and Raheem "played an active role in the prosecution," combined with his lack of documentary evidence supporting any such allegation, dooms his claim of malicious prosecution against them.

2.    Lack of Probable Cause

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). The

court must ask whether there existed "such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." Colon v. City of New York, 455 N.E.2d 1248, 1250 (N.Y. 1983). "When an arrest is made without a warrant and justification for the arrest has not been demonstrated, the 'absence of probable cause' element is satisfied for the malicious prosecution claim." Fortunato v. City of New York, 882 N.Y.S.2d 195, 196 (App. Div. 2009) (citing Broughton, 335 N.E.2d at 315). Where, however, probable cause has been found by a judge at a probable cause hearing, a presumption of probable cause attaches that can only be rebutted by evidence that the finding "was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Dawson v. Snow, 356 F. App'x 526, 529 (2d Cir. 2009) (quoting Colon, 455 N.E.2d at 1250); see Gagliano v. County of Nassau, 817 N.Y.S.2d 651, 652 (App. Div. 2006) ("The judicial determination made after a probable cause hearing in the underlying criminal proceeding that the police had probable cause to arrest the plaintiff bars his cause of action to recover damages for malicious prosecution."). The court must "separately analyze the charges claimed to have been maliciously prosecuted." Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991); accord D'Angelo v. Kirschner, 288 F. App'x 724, 726-27 (2d Cir. 2008) ("[A] finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor.").

Plaintiff's claim for malicious prosecution cannot proceed as to the charges of reckless endangerment, resisting arrest, reckless driving, attempted assault, obstruction of governmental administration, or failure to signal. As discussed in the context of his false arrest claim, Plaintiff's conviction on reckless driving is sufficient to show probable cause for his arrest; the same logic leads the court to conclude that there was probable cause to prosecute him on this

charge. As to the other charges, even though Plaintiff was not convicted of these offenses, the state court chose not to dismiss them pursuant to a probable cause hearing. (Defs. 56.1 ¶ 40.) Once the presumption of probable cause has attached, the plaintiff must produce evidence showing that the prosecution was undertaken as "the result of conduct comparable to fraud or perjury." McClellan v. Smith, 439 F.3d 137, 146 (2d Cir. 2006) (quoting Marshall v. Sullivan, 105 F.3d 47, 55 (2d Cir. 1996)). Unlike in McClellan, in which the plaintiff was able to present evidence unmistakably suggesting police conduct undertaken in bad faith, all Plaintiff can put forth is evidence suggesting a factual disparity between him and the officers regarding the incident. That is insufficient to overcome the presumption of probable cause on a motion for summary judgment. For the same reasons that the court dismisses the claims of malicious prosecution against Wallen and Raheem, the court finds that Plaintiff's claims that Defendants "lied" to commence his prosecution (Pl. Opp'n at 15) and that the prosecutor "knew very well" that the abandoned charges "should be dismissed" (Compl. ¶ 42) would not lead a reasonable jury to "find that the indictment was secured through bad faith or perjury," Boyd, 336 F.3d at 77.

Plaintiff's claim of malicious prosecution based on his unlawful possession of marijuana charge cannot be dismissed at this juncture because the court concludes that there is a triable issue of fact as to whether Defendants had probable cause to charge Plaintiff with unlawful possession of marijuana. Unlike the other six charges on which Plaintiff was arraigned, the state court never found that the QCDA had probable cause to charge Plaintiff with marijuana possession, as this charge was dropped prior to the probable cause hearing. (See Compl. ¶¶ 40-41.) The court must therefore make an independent determination as to whether there existed "such facts and circumstances as would lead a reasonably prudent person to believe [Plaintiff] guilty" of marijuana possession. Boyd, 336 F.3d at 76. Defendants assert that, in the course of a

26

post-arrest inventory search, Benson "recovered a marijunna [sic] cigarette from a cigarette box inside [Plaintiff's] vehicle" (Crim. Ct. Compl. at 2). Plaintiff, meanwhile, maintains that this charge was "bogus" (Pl. Opp'n at 6) and stated during his deposition that, if there was any marijuana found in his car, it must have been planted because "nothing was there" (Pl. Dep. Tr. 95:4-12). At this point, Plaintiff's assertion in the record that the marijuana was planted, combined with the lack of a probable-cause finding on this charge, is enough to raise a question of material fact. See Davis v. City of New York, No. 04-CV-3299 (JFB), 2007 WL 755190, at *15 (E.D.N.Y. Feb. 15, 2007) (declining to grant summary judgment where the plaintiff alleged that the defendants fabricated marijuana evidence); cf. Simms v. Village of Albion, 115 F.3d 1098, 1110 (2d Cir. 1997) (finding a disputed factual issue given the plaintiff's claim that a defendant officer "planted the drugs upon which the probable cause determination was based").

### 3.    Malice

A plaintiff in a § 1983 malicious prosecution action must also allege that the defendants "proceeded against [the plaintiff] with malice." See Manganiello, 612 F.3d at 163. "[T]he absence of probable cause does bear on the malice issue." Martin v. City of Albany, 364 N.E.2d 1304, 1307 (N.Y. 1977); see Hicks v. Marchman, — F. App'x —, 2018 WL 300434, at *2 (2d Cir. 2018) (summary order) ("[M]alice may be inferred from the actual lack of probable cause . . . ."); Boyd, 336 F.3d at 78 ("A lack of probable cause generally creates an inference of malice").

As the court concludes Plaintiff must be permitted to bring the issue of probable cause as to the charge of marijuana possession to the jury, it likewise concludes that his malicious prosecution claim can survive summary judgment on the malice prong. See Rounseville v. Zahl, 13 F.3d 625, 631 (2d Cir. 1994) ("[O]ur conclusion that the lack of probable cause presents a

jury question likewise suggests that the existence of malice cannot be resolved through summary judgment."); Ostroski v. Town of Southold, 443 F.Supp.2d 325, 340 (E.D.N.Y. 2006) (finding, on similar facts, that "a jury could infer malice from a lack of probable cause, which is sufficiently in dispute to survive summary judgment").

        4.    Favorable Termination

"A § 1983 plaintiff claiming malicious prosecution must also establish that the prosecution was terminated in his favor as determined by state law." Smalls v. City of New York, 181 F. Supp. 3d 178, 187-88 (E.D.N.Y. 2016) (citing Hygh v. Jacobs, 961 F.2d 359, 367 (2d Cir. 1992)). Under New York law, "a criminal proceeding is terminated favorably to the accused when there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense." Smith-Hunter, 734 N.E.2d at 753 (internal quotation marks omitted). While "it makes no difference how the criminal prosecution is terminated, provided it is terminated, and at an end," the prosecution cannot have been terminated in a way "inconsistent with the innocence of the accused." Id. (internal quotation marks omitted).

Here, the QCDA dismissed the charge of marijuana possession after Plaintiff's arraignment but before his probable cause hearing. Plaintiff claims that the dismissal of the charge occurred because the QCDA "conced[ed] that the search of Plaintiff's vehicle . . . was in fact an unlawful search," though he does not provide proof of this assertion. (Compl. ¶ 40; see Pl. Opp'n at 18.) Nevertheless, Plaintiff's culpability for the marijuana possession was never decided by the state court, nor have Defendants put forth evidence establishing that the dismissal of this charge occurred for reasons inconsistent with Plaintiff's innocence. See Graham v. City of New York, No. 16-CV-4613 (NGG), 2018 WL 1157818, at *5-6 (E.D.N.Y. Mar. 2, 2018) (discussing favorable termination in the context of charges dismissed due to unlawful search).

Without evidence suggesting that the dismissal of this charge was inconsistent with Plaintiff's innocence, the court cannot conclude that the prosecution on these charges did not terminate favorably.  See Cantalino v. Danner, 754 N.E.2d 164, 168 (N.Y. 2001) (stating that the dismissal of a charge can be a favorable termination if, under the circumstances of the case, the disposition was not inconsistent with the innocence of the accused); see also Graham v. City of New York, 2018 WL 1157817, at *5-6 (listing the factors that courts consider when determining whether a termination was inconsistent with innocence).

>              5.    Deprivation of Liberty

Finally, in suits for malicious prosecution brought under § 1983, the plaintiff must allege that there was a "deprivation of liberty" that was "effected 'pursuant to legal process.'"  Singer, 63 F.3d at 116-17 (quoting Heck v. Humphrey, 512 U.S. 477, 484 (1994)).  A plaintiff can claim a deprivation of liberty under the Fourth Amendment if he was "obligated to appear in court in connection with criminal charges" following his arraignment.  Evans v. City of New York, No. 13-CV-5341 (MKB), 2015 WL 1345374, at *6 (E.D.N.Y. Mar. 25, 2015) (alteration adopted) (quoting Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013)).

Plaintiff's § 1983 claim fails because he cannot disentangle the constitutionally permissible court appearances he made in conjunction with these charges from any allegedly impermissible deprivations of liberty as a result of the marijuana possession charge.  See Walker v. Sankhi, 494 F. App'x 140, 143 (2d Cir. 2012) (summary order) (finding that the plaintiff could not show a deprivation of liberty where he was subject to police custody pursuant to a separate charge of which he was ultimately convicted).  Defendants assert, correctly, that Plaintiff cannot show his court appearances resulted "solely" from the marijuana charge, as "he was required to

appear in court the same number of times" to defend against the reckless driving charge on which he was ultimately convicted.  (Mem. at 24.)

\*       \*       \*

Because Plaintiff cannot show that he was deprived of liberty pursuant to legal process as a result of his charge of marijuana possession, the court dismisses Plaintiff's § 1983 claim for malicious prosecution against all Defendants.

### D.    Unlawful Search

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted).  "If it is established that the place or object subjected to the warrantless search is one in which the plaintiff has a reasonable expectation of privacy, the defendant has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement." McCardle v. Haddad, 131 F.3d 43, 48 (2d Cir. 1997).

Plaintiff alleges that Defendants effected two warrantless searches in violation of his Fourth Amendment rights: a search of his person and vehicle incident to arrest; and an inventory search of his vehicle following his arrest.  Plaintiff did not challenge either of these searches during his state criminal court proceedings so his claims are not barred by collateral estoppel. For the following reasons, the court grants Defendants' motion for summary judgment as to both searches.

1.    Search Incident to Arrest

A search incident to a lawful arrest is a "well-delineated" exception to the Fourth Amendment's warrant requirement. Arizona v. Gant, 556 U.S. 332, 338 (2009). "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." Id. This exception only applies if there is a "possibility that an arrestee could reach into the area that law enforcement officers seek to search." Id. at 339. That is, in order to receive legal protection, the search incident to arrest must take place within "the arrestee's person [or] the area 'within his immediate control.'" Id. (quoting Chimel v. California, 395 U.S. 752, 763 (1969)). "An arrest pursuant even to a simple traffic violation permits a search incident to arrest." Evans v. Solomon, 681 F. Supp. 2d 233, 248 (E.D.N.Y. 2010) (citing United States v. Robinson, 414 U.S. 218, 224 (1973)); see United States v. Scopo, 19 F.3d 777, 782 (2d Cir. 1994) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." (internal quotation marks omitted)).

Plaintiff claims that the search of his person and his vehicle "cannot be justified as incident to arrest" because he "was arrested under the guise of bogus charges." (Pl. Opp'n at 18.) As discussed above, the officers had probable cause to arrest Plaintiff for reckless driving, a charge of which he was later convicted. Once the officers had probable cause to arrest Plaintiff for this offense, they were permitted to search his person and the space immediately within his reach incident to that arrest. See Scopo, 19 F.3d at 782. Plaintiff does not allege that the officers searched any areas outside of his control, and the court cannot find any evidence of this having occurred. As such, the court rejects Plaintiff's claim of constitutional injury from the search incident to arrest.

31

2.    Inventory Search

"An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items, and to protect against false claims of loss or damage." United States v. Miller, 382 F. Supp. 2d 350, 377 (N.D.N.Y. 2005) (citing Whren v. United States, 517 U.S. 806, 811 n.1 (1996)). The inventory search is a "well-defined exception to the warrant requirement." Illinois v. Lafayette, 462 U.S. 640, 643 (1983). An inventory search is lawful as long as it is conducted "in good faith pursuant to 'standardized criteria . . . or established routine." United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994) (alteration in original) (quoting Florida v. Wells, 495 U.S. 1, 4 (1990)).

Plaintiff asserts a constitutional tort claim based on an alleged invalid inventory search of his car. His only citation for this allegation is the supposed admission by the Queens County Assistant District Attorney in charge of Plaintiff's criminal case "that no valid inventory search of Plaintiff's vehicle was conducted." (Pl. Opp'n at 18.) As Defendants correctly point out, "[P]laintiff does not set forth any specifics of the purported unlawful search," but they take Plaintiff to be referring to the claim that Benson recovered a marijuana cigarette from inside Plaintiff's vehicle following his arrest. (Mem. at 25-26; Crim. Ct. Compl.) Plaintiff does not say anything further about this claim.

In disputing whether the inventory search of Plaintiff's person and vehicle ran afoul of the Fourth Amendment, however, Defendants point to the incorrect legal standard. They claim that the inventory search was valid because Plaintiff's arrest was supported by probable cause. (Mem. at 26.) In so asserting, they ignore the fact that "there is no need for the government to have probable cause before conducting an inventory search." United States v. Santos, 961 F. Supp. 71, 72 (S.D.N.Y. 1997) (Scheindlin, J.); see Lafayette, 462 U.S. at 644-45 ("[P]robable

32

cause to search is irrelevant in inventory searches." (internal quotation marks omitted)). Instead, as set forth above, a lawful inventory search must accord with established departmental procedures. Defendants do not set forth any evidence establishing that NYPD procedures permit them to conduct inventory searches, nor that the search of Plaintiff's vehicle was conducted in accordance with those procedures.

Both Plaintiff and Defendants have glaring defects in their claims as to the legality of the inventory search of Plaintiff's car. Nevertheless, the Second Circuit has stated that the presumption that warrantless searches are unreasonable "may cast upon the defendant the duty of producing evidence of . . . exceptions to the warrant requirement. However, the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials." Ruggiero v. Krzeminski, 928 F.2d 558, 563 (2d Cir. 1991). The burden thus falls upon Plaintiff to "submit[] competent evidence to create a genuine issue as to whether Defendants' [search] was unreasonable." Jackson v. City of New York, 29 F. Supp. 3d 161, 176 n.20 (E.D.N.Y. 2014). Plaintiff has not clearly alleged the facts of the inventory search of his car, how the search ran afoul of the Fourth Amendment, nor that the search did not comport with applicable departmental procedures. The court therefore rejects Plaintiff's claim of constitutional injury from the inventory search of his vehicle.

### E. Municipal Liability

"[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). "[T]o hold a city [or municipal actor] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195

(2d Cir. 2007) (alteration in original) (quotations and citation omitted).  The "policy or custom" requirement may be satisfied by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policy makers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Skates v. Inc. Village of Freeport, 265 F. Supp. 3d 222, 235 (E.D.N.Y. 2017).  A plaintiff bringing a § 1983 claim for municipal liability also must establish a causal connection between the municipality's official policy and the underlying constitutional violation.  See Stern v. City of New York, No. 12-CV-5210 (NGG), 2015 WL 3827653, at *5 (E.D.N.Y. June 19, 2015).

Plaintiff claims that the City of New York is liable because it "has a policy and custom of encouraging misconduct and abuse by its police officers."  (Pl. Opp'n at 19.)  Plaintiff alleges that the City "was/is aware that the police officer defendants are unfit officers who have previously repeatedly committed the acts of abuse and misconduct complained of herein," pointing to "the service and personnel records of said police officer defendants" as well as a litany of settled civil law suits against the defendants.  (Compl. ¶¶ 94-96.)  According to Plaintiff, this evidence shows the City's deliberate indifference towards "the repeated abuse and misconduct of said defendants" and that the City is liable for failing to properly train or supervise the Individual Defendants and for improperly retaining them as employees.  (Id. ¶ 97.)

Analyzing Plaintiff's claims under the fourth category of Monell, the court agrees with Defendants that Plaintiff has failed to allege facts that would set forth municipal liability.  Simply, Plaintiff needed to proffer evidence showing with specificity the City's knowledge of the Individual Defendants' constitutional violations and deliberate indifference thereto.  The only

evidence he marshals in support of his claim is a litany of civil law suits against the Individual

Defendants that the City settled, but "[t]he fact that other individuals have alleged 'that they

experienced similar violations of their constitutional rights' does not mean that 'those violations

actually occurred.'" Graham v. City of New York, 2018 WL 1157818, at *9 (quoting Simms v.

City of New York, 480 F. App'x 627, 630 (2d Cir. 2012)).  Plaintiff therefore has no claim for

municipal liability under § 1983.

## V.   CLAIMS UNDER STATE LAW

Plaintiff brings five claims under state law: Assault and battery; false arrest; malicious

prosecution; unlawful search; and respondeat superior liability.  For the reasons that follow, the

court GRANTS Defendants' motion for summary judgment on all claims except the assault and

battery claim against Benson and the malicious prosecution claim against Benson and Dailey.

### A.   Assault and Battery

"Federal excessive force claims and state law assault and battery claims against police

officers are nearly identical."  Graham v. City of New York, 928 F. Supp. 2d at 624.  Because

the court dismisses Plaintiff's § 1983 excessive force claims based on handcuffing, the pointing

of guns, the "shoving" of Plaintiff into the police minivan, and Dailey's failure to intervene, the

court also dismisses the equivalent state assault and battery claims.  Because, however, the court

finds a triable issue of fact as to Plaintiff's § 1983 excessive force claim against Benson based on

his alleged "choking" of Plaintiff, the court cannot grant Defendant summary judgment on the

equivalent state assault and battery claim or related claims of immunity.  Cf. Lloyd, 246 F. Supp.

3d at 729 (denying summary judgment on a state assault and battery claim where summary

judgment was denied on equivalent § 1983 excessive force claim).

### B.    False Arrest

"A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." Weyant, 101 F.3d at 852.  As in federal law, "[t]he existence of probable cause to arrest . . . is a complete defense to an action for false arrest." Id. (internal citations and quotation marks omitted).  Because the Individual Defendants had probable cause to arrest Plaintiff, his state claim for false arrest must be dismissed.

### C.    Malicious Prosecution

As set forth above, the elements of a § 1983 claim for malicious prosecution are borrowed from state law.  See Conway, 750 F.2d at 214.  Applying these elements to Plaintiff's claim under § 1983, the court finds that Plaintiff has established a triable issue as to whether Dailey and Benson had committed the state tort of malicious prosecution with regard to the charge of marijuana possession, but grants Defendants' motion for summary judgment because Plaintiff did not suffer a deprivation of liberty resulting from this charge.  See supra Section IV(C).

Under New York law, however, a plaintiff bringing a claim of malicious prosecution need not allege a deprivation of liberty.  Because Plaintiff has established all of the required elements for this claim to proceed, the court accordingly denies Defendants' motion for summary judgment as to Plaintiff's claim for malicious prosecution stemming from the charge for marijuana possession.  The existence of a triable issue of fact as to whether there was probable cause to charge Plaintiff with marijuana possession suffices to overcome any defense of qualified immunity.  See MacDonald v. Town of Greenburgh, 976 N.Y.S.2d 189, 191 (App. Div. 2013).

D.   **Unlawful Search**

The courts of New York have made clear that a cause of action sounding in tort under the New York State Constitution "is a 'narrow remedy'" that is "usually available only in cases in which a plaintiff . . . has no alternative remedy." Biswas v. City of New York, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (quoting Brown v. State, 674 N.E.2d 1129, 1141 (N.Y. 1996)). Accordingly, Defendants argue that Plaintiff's claim for unlawful search under state law should be dismissed as duplicative with his § 1983 claim on the same basis.  (Mem. at 24 n.7.)  To the extent that Plaintiff's state claim for unlawful search is brought under the New York Constitution, the court agrees that his claim must be dismissed.

Regardless, Plaintiff's state claims of unlawful search must fail for the same reasons that the court grants summary judgment for Defendants on Plaintiff's § 1983 claims on this ground.

E.   **Respondeat Superior**

Because the court finds that Plaintiff's claims for municipal liability under state law are barred by his failure to wait to file suit until after the City had an opportunity to reschedule his 50-h hearing, the court dismisses with prejudice Plaintiff's claims against the City under the doctrine of respondeat superior.

VI.   **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 53) is GRANTED IN PART and DENIED IN PART.  The following claims may proceed in accordance with this opinion: Plaintiff's claim for excessive force under § 1983 as to Defendant Benson; Plaintiff's claim for assault and battery under state law as to Defendant Benson; and Plaintiff's claim for malicious prosecution under state law as to Defendants Benson and Dailey. The court DISMISSES WITH PREJUDICE Plaintiff's § 1983 claims of false arrest, unlawful

search, malicious prosecution, and municipal liability; Plaintiff's state claims of false arrest, unlawful search, and municipal liability under the doctrine of respondeat superior; and Plaintiff's remaining § 1983 claims of excessive force, state claims of assault and battery, and state claims of malicious prosecution.  The clerk of court is respectfully DIRECTED to send a copy of this order by certified mail, return receipt requested, to pro se plaintiff at his address of record.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2018

NICHOLAS G. GARAUFIS
United States District Judge